471 So.2d 1206 (1985)
Rosalie KERGOSIEN
v.
Ames A. KERGOSIEN.
No. 54800.
Supreme Court of Mississippi.
June 5, 1985.
*1207 Thomas D. Berry, Jr., Gulfport, for appellant.
Henry J. Cook, III, Cook, Tucker & Sharp, Bay St. Louis, for appellee.
Before ROY NOBLE LEE, P.J., and HAWKINS and SULLIVAN, JJ.
SULLIVAN, Justice, for the Court:
Rosalie Kergosien filed suit for separate maintenance and alimony in the Chancery Court of Hancock County, Mississippi. Ames Kergosien filed a counterclaim for divorce, on the ground of habitual cruel and inhuman treatment. At the conclusion of the evidentiary hearing, Chancellor Jason Floyd sustained the counterclaim and granted Ames Kergosien a divorce on the grounds of cruel and inhuman treatment, and awarded Rosalie Kergosien $250 per *1208 month per child for child support and $500 per month in alimony.
Mrs. Kergosien appeals and assigns the following errors:
I. Granting the divorce for habitual cruel and inhuman treatment on the basis of insufficient evidence;
II. Denying the complaint for separate maintenance and support; and
III. Awarding inadequate amounts of alimony, child support and attorney fees.
Appellant and appellee were married on August 24, 1963, and had six children, the oldest of which is 21 years old at this time. Appellee maintains a real estate and insurance business in Bay St. Louis, while appellant is licensed as a registered nurse.

I.

DID THE TRIAL COURT ERR IN GRANTING A DIVORCE FOR HABITUAL CRUEL AND INHUMAN TREATMENT ON THE EVIDENCE BEFORE IT?
Viewed in its kindest light, the testimony offered by Ames Kergosien to support his claim of divorce on the ground of habitual cruel and inhuman treatment falls woefully short of that required by our law.
The record reflects that Rosalie Kergosien's manner of handling money caused Mr. Kergosien hardship and embarrassment. She would not balance the checkbook or keep the statements, and she constantly caused the account to be overdrawn. Her failure to pay utility bills and to pay attention to disconnect notices caused Mr. Kergosien to get all the bills sent to him at his office.
Mr. Kergosien complains that Rosalie Kergosien also disappeared and abandoned her family duties on several occasions. This testimony in its particulars amounted to her spending six days with her mother in Kiln, Mississippi, during the 1981 Christmas holidays. This forced Mr. Kergosien to take care of their children and prepare a Christmas Eve party. The eldest child of these parties testified that his mother would leave the home during the day and on weekends and no one knew where she was. Mr. Kergosien's employees testified that Mr. Kergosien received several calls a week to come care for the children because his wife was not at home. When one of the children cut his foot, Mrs. Kergosien was absent, and Mr. Kergosien was called to take the child to the emergency room by a neighbor. In July, 1982, while dining out at a restaurant, Mrs. Kergosien got up and left Mr. Kergosien without any explanation, so that Mr. Kergosien had to ride home with the priest they had invited to dinner. On one occasion, Mrs. Kergosien served as a chaperone in the Miss America Pageant and was gone from the house for 17 days. On one other occasion, Mrs. Kergosien locked Mr. Kergosien out of the house and he had to break the door down to get in.
Mr. Kergosien complains that his wife occasionally bought jewelry without telling him, and that his own employees added it to his insurance policy without telling him.
Mr. Kergosien testified that his wife committed acts of cruelty against the six children to "get at" Mr. Kergosien. After the parties had separated, when their 14-year-old daughter stated a preference to live with Mr. Kergosien, Mrs. Kergosien became angry, slapped her and cursed the girl. The oldest son of the parties testified that prior to the separation of the parties, Mrs. Kergosien told him that she hated him and ordered him to leave the family home. On one occasion, she actually threw his belongings into the front yard.
Finally, there was testimony that the adult Kergosiens frequently argued, and that Mrs. Kergosien complained in front of the children about having to take care of all six of them by herself.
Mr. Kergosien testified that he left his home on August 16, 1982, and refused to return. His total real estate holdings were worth approximately $271,800 and he had savings of approximately $60,192.
It is not uncommon to Mississippi Chancery Practice that a chancellor when hearing *1209 a divorce case will determine that, although the grounds for divorce have not been shown, the marriage itself is actually dead. We view with some sympathy the reaction of chancellors in these circumstances as they grant the divorce, throwing sand over the cadaver of the marriage.
However, within the past year, this Court has reversed three divorces which were granted on grounds of habitual cruel and inhuman treatment on the basis that the acts complained of were not such as to constitute habitual cruel and inhuman treatment. In Marble v. Marble, 457 So.2d 1342 (Miss. 1984), this Court wrote:
In discussing habitual cruel and inhuman treatment as grounds for divorce, we said in Howard v. Howard, 243 Miss. 301, 303-304, 138 So.2d 292, 293 (1962),
"The popular idea is that, like charity, it covers a multitude of marital sins, and is the easiest road to freedom from the marital bonds. As a result suits are often brought, based on petty indignities, frivolous quarrels, general incompatibility and the petulant temper of one or both parties, seeking divorce for habitual cruel and inhuman treatment, without ever realizing or understanding, in the remotest degree, what is meant by the words as used in the statute. They do not realize the nature, gravity, or duration of the cruelty required to warrant a divorce * * * The cruelty required by the statute is not such as merely to render the continuance of cohabitation undesirable, or unpleasant, but so gross, unfeeling and brutal as to render further cohabitation impossible, except at the risk of life, limb, or health on the part of the unoffending spouse; and that such risk must be real rather than imaginary merely, and must be clearly established by the proof." (Emphasis added.)
The parties are not compatible. Rebecca Marble's religious views differ from her husband's, and she is unable or unwilling to be as fastidious a housekeeper and as demonstrative as he would like. While John Marble appears genuinely unhappy in this marriage, in our opinion, he has not proved this dissatisfaction is caused by any cruel and inhuman treatment on Rebecca's part.
Id. at 1343.
This Court again denied a divorce on the grounds of habitual cruel and inhuman treatment in Gallaspy v. Gallaspy, 459 So.2d 283 (Miss. 1984). The Court said:
The facts appellee gave as constituting habitual cruel and inhuman treatment were appellant's criticism of her being overweight; that his first priority was his work, where he spent long hours when he could have been at home; that his second priority was his mother and his father's estate; that he was critical of appellee's family; and that he did not praise or support the children enough and his discipline was too severe for them.
In order to justify a divorce on the ground of habitual cruel and inhuman treatment, such treatment must be so continuous and of such a nature that the offended spouse can no longer live with the other spouse on account of that treatment and, therefore, separates herself from such spouse. The facts of the case sub judice simply do not pass the test of habitual cruel and inhuman treatment. Under the facts, appellee could have waited for a period of one year, filed suit for divorce on the ground of wilful, continued and obstinate desertion for the period of one year, and, without question, she would have been entitled to a divorce from the appellant.
Id. at 285.
Finally, in Stennis v. Stennis, 464 So.2d 1161 not yet reported, this Court, reviewing Marble and Gallaspy, found that habitual cruel and inhuman treatment was not proven where the evidence included the facts that a husband once slapped his wife, once put her in a hammerlock, and once washed her mouth out with soap. The wife testified that she had lost her love for her husband, resented living in a small town, and was incompatible with him. Stennis *1210 reversed the lower court "with the understanding that the lower court has adequate powers and authority to adjudicate the rights of the parties and the decision here does not prejudice any of them in the enforcement of those rights." At 1162.
In Wires v. Wires, 297 So.2d 900 (Miss. 1974), this Court upheld the charge of habitual cruel and inhuman treatment where the proof showed that the wife was jealous and accused the husband of philandering with his secretary; that her bickering caused their son to leave home; and that she made anonymous calls to his secretary. Appellee said that all of this caused him to have a knot in his stomach.
In upholding the divorce, this Court said:
It is true these cases held that habitual cruel and inhuman treatment should be sustained by "clear and convincing evidence." This conclusion was based upon the thesis that mental cruelty without violence required clear and convincing evidence to substantiate the charge. We have reexamined the authorities as to the degree of evidence required, and we are now of the opinion that habitual cruel and inhuman treatment may be established by a preponderance of the creditable evidence.
We agree, however, that the charge of cruel and inhuman treatment against one spouse means something more than unkindness or rudeness or mere incompatibility or want of affection. It has been said that:
"The conduct of the offending spouse must be so unkind as to be cruel, that is, so unreasonably harsh and severe as to be inhumane, so lacking in human qualities, so unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb, or health. And finally, such conduct must be habitual, that is, done so often, or continued so long, that its recurrance may be reasonably expected whenever occasion or opportunity presents itself." Bunkley and Morse, Amis on Divorce and Separation in Mississippi § 3.14(3), at 114 (1957); cited in Burnett v. Burnett, 271 So.2d 90, at 92 (Miss. 1972).
On the other hand, habitual ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy health and endanger the life of an innocent spouse. Bunkley and Morse, Amis on Divorce and Separation in Mississippi § 3.14(8), at 122 (1957).
Id. at 902.
The proof in this case is insufficient to prove habitual cruel and inhuman treatment. There is evidence of incompatibility, and occasional acts of deceit, some of which occurred after the separation. However, there is no proof that Mrs. Kergosien's mismanagement of family funds, disappearances, or alleged mistreatment of the children rendered continuance of cohabitation impossible, except at the risk of life, limb, or health on the part of Mr. Kergosien. Nowhere in the testimony is there anything indicating that the appellee's health was even slightly impaired, as in Wires. Mr. Kergosien testified that he was embarrassed and ashamed when his wife left the dinnertable at the restaurant, but another member of the dinner party testified that he recalled no "scene" or any statements that upset him.
For this reason, the judgment of divorce must be reversed. In so doing, we do not tell the chancellor that we perceive this marriage to be alive and well. It may well be dead. However, it must be given the last rites in accordance with the dictates of the Mississippi Legislature. Divorce is a creature of statute; it is not a gift to be bestowed by the chancellor based upon a perception that declining to grant the divorce will not restore the couple to a harmonious marital relationship. It is a statutory act and the statutes must be strictly followed as they are in derogation of the common law. The testimony in this record is not such that would justify the granting of a divorce upon the grounds of habitual cruel and inhuman treatment.

*1211 II.

DID THE CHANCELLOR ERR IN FAILING TO GRANT SEPARATE MAINTENANCE?
The prerequisites for separate maintenance are (1) separation without fault on the wife's part, and (2) willful abandonment of her by her husband with refusal to support her. See Bunkley and Morse, Amis Divorce and Separation in Mississippi § 7.01.
Mr. Kergosien admitted that he left his wife and refused to return, while she stated that she was willing to accept him back. After the separation, Mrs. Kergosien needed money so badly that she made up fictitious jewelry receipts and wrote checks on her husband's business account. Mr. Kergosien, since the separation, had put $200 in Mrs. Kergosien's account.
The chancellor was manifestly wrong in granting the divorce and for that reason was reversed. We are left with the record on the issue of support and separate maintenance.
Separate maintenance may be awarded when the facts do not justify the granting of a divorce. Cox v. Cox, 279 So.2d 612 (Miss. 1973). Therefore, this is a case where the granting of separate maintenance would have been appropriate.
Separate maintenance generally will not be awarded to a spouse whose conduct was a material factor in the separation at least equal to that of the other spouse. Chaffin v. Chaffin, 437 So.2d 384, 386 (Miss. 1983).
The appellee urges that Cox, supra, Burnett v. Burnett, 271 So.2d 90 (Miss. 1972), and Rodgers v. Rodgers, 349 So.2d 540 (Miss. 1977), represent authority for the chancellor's refusal to allow Mrs. Kergosien separate maintenance. We disagree.
In Cox, the headnote does make the bold assertion that the wife is not entitled to separate support and maintenance where her conduct materially contributed to the separation. On its facts, there can be no doubt that Mrs. Cox materially contributed to the separation. She berated her husband in language most foul. She belittled his manhood. She threatened his livelihood. Further, Mrs. Cox put Mr. Cox out of the house. Under such circumstances, she was not entitled to live apart and be supported by her husband. Cox, supra, at 614. No such facts exist in this case.
In Burnett v. Burnett, supra, Mrs. Burnett did not get separate maintenance and support because she did not ask for it! She was, however, awarded support money for her minor child. This authority offers cold comfort to Mr. Kergosien, as his wife pursued her remedy of support money and separate maintenance.
Rodgers v. Rodgers, supra, is distinct from Kergosien on several points. In Rodgers, there was no prayer for support money and separate maintenance. There was no allegation that the separation was without fault on the wife's part. Furthermore, Mrs. Rodgers, far from being blameless, actually stabbed Mr. Rodgers some several minutes after an altercation between them. She also maintained a male companion over the objection of her husband. Her blame was equal to or greater than the blame of her husband for the separation. No such lurid facts highlight the record in the Kergosien case. Mrs. Rodgers affirmatively stated that she could no longer live with Mr. Rodgers as his wife. At the polar extremity of this testimony is the testimony of Mrs. Kergosien that she could live with Mr. Kergosien, wanted to live with Mr. Kergosien, did not want him to leave their home, and would welcome him back to the marriage that she had never wanted him to abandon in the first place.
Under these facts, we hold that the chancellor was in error when he denied support money and separate maintenance to the appellant.
We reverse the chancellor on his refusal to grant support money and separate maintenance and we render judgment for the appellant here on that issue.
*1212 As will be seen, we remand to the trial court the issue of the amount of support money, both for the children and the appellant.

III.

WERE THE AMOUNTS FOR ALIMONY, CHILD SUPPORT AND ATTORNEY FEES INADEQUATE?
Mrs. Kergosien provided the court with an itemized statement of monthly living expenses. She estimated her monthly total living expenses at $2,465. She is in fairly good health although she does have high blood pressure and a hearing problem.
Mr. Kergosien's net income for 1979 was $51,000; in 1980 it was $67,900; in 1981 it was $79,700. Mr. Kergosien, a real estate appraiser, valued his interest in 19 separate pieces of real estate, including the family home and office, to be approximately $271,800. He also has savings accounts totaling $60,192.
The chancellor ordered Mr. Kergosien to pay his wife $250 per month per child not under his care for a total of $1,000 per month child support, but this amount was reduced to $625 per month during the summer. Mrs. Kergosien was awarded alimony in the sum of $500 per month, together with the use of the family home on which Mr. Kergosien was ordered to pay the mortgage, taxes and insurance. The chancellor awarded Mrs. Kergosien the 1979 Oldsmobile and required Mr. Kergosien to maintain medical insurance on all the children.

ALIMONY
Inasmuch as we have held that no divorce should have been granted, no alimony can be awarded. § 93-5-23, Mississippi Code Annotated (Supp. 1983). The appellant is entitled to support money for herself and the children and to separate maintenance. The award of $500 per month alimony is reversed.

CHILD SUPPORT
The appellant is entitled to support money in keeping with the appellee's ability to pay and the standard of living to which the appellant and the children have become accustomed. The trial court erroneously considered his alimony award in his calculation of child support and apparently did not consider the uncontradicted testimony by Mrs. Kergosien of her monthly financial need. We, therefore, reverse and remand this issue to the trial court for further findings not inconsistent with this opinion.

ATTORNEY FEES
As to the question of attorney's fees raised by the appellant, that matter is largely entrusted to the sound discretion of the trial court. McKee v. McKee, 418 So.2d 764, (Miss. 1982). $1,000 was awarded as attorney's fees, half of which was to be paid by Mr. Kergosien prior to trial. Mrs. Kergosien contends that more attorney's fees were appropriate since Mr. Kergosien held a considerable amount of real estate which required a time-consuming perusal of the land records.
In McKee, we set forth the criteria for gauging the appropriate amount of attorney's fees in a divorce proceedings:
(1) A sum sufficient to secure one competent attorney is the criteria to be utilized;
(2) The fee depends on consideration of, in addition to relative financial ability of the parties, the skill and standing of attorney employed,
(3) Nature of case and novelty and difficulty of questions at issue, as well as degree of responsibility involved in management of the case, time and labor required, usual and customary charge in the community, and the preclusion of other employment by attorney due to acceptance of the case.
The attorney for Mrs. Kergosien failed to offer any evidence of the criteria in McKee to aid the court in assessing an appropriate award. Therefore the chancellor's sound discretion in this matter will not be disturbed.
*1213 Appellant is granted judgment in the sum of $1,000 against the appellee for her use and benefit as attorney's fees in the prosecution of this appeal.
The granting of the divorce is reversed. The denying of separate maintenance and support is reversed and rendered. The award of alimony is reversed, and the case is remanded for trial on the question of the amount of the awards that should be given for support of the wife, child support and separate maintenance. The award of attorney's fees by the trial court for services granted in the trial court is affirmed.
REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART; AFFIRMED AS TO AWARD OF ATTORNEY'S FEES IN THE TRIAL COURT.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and ANDERSON, JJ., concur.